WILLIAMS *v.* STATE.

4321                                                    174 S. W. 2d 444

Opinion delivered October 11, 1943.

*Byron Goodson* and *Gordon B. Carlton,* for appellant.

*Guy E. Williams,* Attorney General and *Earl N. Williams,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. Ben Williams, who appeals from a grand larceny conviction, is a resident of. McCurtain County, Oklahoma—immediately west of Sevier County, Arkansas.

The indictment charged the defendant with stealing one red sow and eight shoats, the property of Emmett Willis, also of McCurtain County. It is satisfactorily established that Allen and Carson,[1] sons of Ben Williams, drove their father's team; and, using his wagon, went at

---

[1] Neither Allen nor Carson testified. The latter was in the Army.

night to a pen on Robert Leeper's place where Joe Ford lived and took certain hogs. According to Leeper, estrays came to his place in Sevier County. One was a sow marked with a swallow fork in each ear. Another sow, heavy with pigs, was in a meadow nearby.

Ford testified that one of the shoats he put in the pen with the sow was marked with a small crop off each ear; others were unmarked. The witness saw them later —after they had been recovered by Willis—and all had been re-marked.

Willis testified he lost one red shoat and a red and black spotted sow. On cross examination he said all of the shoats found at Ford's were from sows owned by M. M. Huddleston, and Huddleston testified he sold Willis some hogs, "mostly black and white spotted, and one red sow." [2]

Two questions were presented: (a) Was there substantial evidence to sustain the judgment? (b) If appellant is guilty, did the crime occur in Sevier County? There is sufficient evidence to support the jury's finding that hogs belonging to Willis were on Leeper's place and that asportation was consummated by Allen and Carson Williams. Appellant told Willis he had not been in Arkansas.

Mrs. Joe Ford testified that her husband, assisted by Leeper, Bill Blankenship, and one of Blankenship's boys, penned some hogs on the place where she was living. Ben Williams came the same day and claimed them. He was accompanied by Allen Williams. When Ben started to leave, he directed Mrs. Ford to tell her husband and Leeper "they would be after the hogs in the morning." On cross examination Mrs. Ford testified the hogs were put up on Monday and her conversation with Williams occurred the following day.

Joe Ford testified that when he saw the hogs after they had been recovered by Willis, the sow's tail had been cut off and other mutilations were such that he did not think anyone could describe the marks.

---

[2] The five hogs (all shoats) sold by Huddleston to Willis were marked with a swallow fork in each ear.

Willis, in addition to testimony heretofore referred to, told of having received information that his lost hogs were in Leeper's field. On going there he found one of his sows in the meadow, "within fifty yards of where I found the pigs." This sow was not described in the indictment. Willis testified that it had more black on it than the one Leeper told him had been taken from the pen. Willis then went to appellant and discussed the matter with him. Willis testified appellant told him that "somebody said I had some hogs in Arkansas, but I haven't been to see and don't know anything about it." Appellant further stated that the "boys got some hogs but I have not seen them." Williams agreed to assist Willis in searching for the hogs. They would meet on Adams Creek, half a mile from Ford's home. Willis was late in arriving at the appointed place, but says his son went to Jones' Mill "and stayed there until 11:00 and they didn't show up." Willis, accompanied by Jim and John Brummett, went to Ford's a little after sunup— "before daylight." Ford aided them in trailing. About half a mile [from Ford's pen, presumptively]fresh tracks were found in the frost. Farther up the road the searchers found where a wagon had been turned around. Willis and his companions "followed the tracks and met some tracks coming back east." There were indications that the hogs had jumped from the wagon, which they back-trailed.

The testimony lacks precision regarding movements of the men, and in respect of their observations. Here, for the first time, there is reference to *the* pen—apparently one owned by appellant or to which he and others had access. His testimony at page 122 of the transcript is an admission by appellant that he built the pen and maintained it three hundred yards from the southwest corner of the field. Willis then says:—"Anyway my brother back-tracked the wagon to where the hogs were penned." This last reference *could* have been to the pen on Leeper's place, but probably was not.

Wagon tracks led to the pen where a fire had been built during the night. Blood smears, contended by the

State to have been made when old brands were eradicated and new ones made, were found.

After observing these conditions the witness followed wagon [3] tracks to a point near appellant's home. Later in the day Ford and Leonard found a litter of pigs within fifty yards of where the vehicle had been turned. The sow and other hogs were found a day or two later about three quarters of a mile from where this witness said they had been unloaded.

There was other evidence supporting the State's theory that, while appellant may not have accompanied his sons on their felonious foray, he went to Sevier County and expressed an intent to return and take possession of the animals in Ford's pen. On the other hand, it is shown in defense that Ben Williams purchased a sow and three gilts in October preceding the time of Willis' loss in December. Appellant's assertion is that he had lost some hogs; that they resembled those claimed by Willis; that his sons acted in good faith in taking the property, and that if mistake has occurred it is traceable to an error in identification.

There is substantial testimony that appellant was in Sevier County—a fact he denied—and that he said he would return and take the hogs back to Oklahoma. This of itself would not be sufficient to convict, even though the result appellant had in mind accrued through the agency of his sons. But there are other circumstances from which inferences, as distinguished from speculation and conjecture, may be reasonably drawn. Appellant's conduct in his discussions with Willis, his ownership of the intermediate pen to which the hogs were taken, the change of brands effectuated in an apparent effort to conceal identity, use of appellant's wagon at an unusual hour—these were matters the jury had a right to consider in determining guilt or innocence.

Venue was proved, even though appellant did not return to Sevier County with his sons or engage in acts

___

[3] Appellant's wagon was a converted affair, utilizing automobile wheels equipped with pneumatic tires, the tread of which made a distinctive pattern which witnesses testified were identical with the marks found at the pen and those variously traced.

other than those testified to: The rule stated in § 134, chapter on Criminal Law, 22 C. J. S., p. 219, is applicable. See *Cousins* v. *State,* 202 Ark. 500, 151 S. W. 2d 658. While it is true no words by appellant taken alone would render him a conscious wrongdoer, yet under the State's theory for which there is sufficient support, Williams' expression of intent must be appraised in the light of subsequent acts and all circumstances attending the final result. There was supporting testimony for an essential ingredient of the verdict—felonious intent within the jurisdiction where judgment was rendered, from which the action flowed. Affirmed.